UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
BROWARD DIVISION

CASE NO. 0:19-cv-60883-WILLIAMS/VALLE

REINIER FUENTES,

    Plaintiff,
vs.

CLASSICA CRUISE OPERATOR LTD., INC.,
a Foreign Profit Corporation

    Defendant.
_____/

**CLASSICA CRUISE OPERATOR LTD., INC.'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant, CLASSICA CRUISE OPERATOR LTD., INC., a Foreign Profit Corporation ("CLASSICA CRUISE"), by and through undersigned counsel, and under Federal Rule of Civil Procedure 56 and Local Rule 56.1, files its Statement of Material Facts in support of its Motion for Summary Judgment and states:

**A. The subject cruise**

    1.    On the day of the subject incident, May 13, 2018, Plaintiff, Reinier Fuentes, was a passenger aboard the vessel *Grand Classica*. *See* Exhibit "A," Plaintiff's Complaint at ¶ 10.

    2.    Plaintiff was aboard the ship with his wife, Lilian Dominguez, who was pregnant at the time of the incident. *See* Ex. "A" at ¶ 11.

    3.    Plaintiff alleges personal injuries after an altercation with another male passenger, Clynt Hadley, while standing in line during the disembarkation process. *See* Ex. "A" at ¶ 13.

    4.    At the time of the incident at issue, the *Grand Classica* is a 2-night cruise ship voyage from West Palm Beach, Florida to Grand Bahama, Bahamas. The *Grand Classica* is

currently sailing from West Palm Beach, Florida to Nassau, Bahamas. *See* Exhibit "B," Declaration of Grant Plummer.

5. The ship caters to people of all ages and includes several dining options, 2 swimming pools, live entertainment, kids' programs, a casino and spa, among many other activities. *See* Ex. "B."

6. The voyage in question debarked from West Palm Beach, Florida on May 11, 2018 and returned on May 13, 2018. *See* Ex. "B."

**B. The initial encounter between Plaintiff and Mr. Hadley – May 12, 2018.**

7. Plaintiff had his first initial encounter with Mr. Hadley on May 12, 2018, the night before the incident at hand. He was playing foosball with his wife when Mr. Hadley and his friends approached and allegedly started taunting Plaintiff.

> Q: This is on May 12th, the day you went off ship?
> A: Yes. Yes.
> Q: After you returned?
> A: At night, yeah. At night. I remember after we ate -- yeah. After we ate, that's when I -- the gentleman that initially started that situation with me on the 13th was with his buddies walking around drinking as well, and he bumped into the foosball table and I was with my wife and then he said, "Oh, you should win," and he was like looking, she's pretty, you know, she's young, she's -- let me see, she's twenty -- she was born in '95. She 24 now. She was 22. I don't know. She wasn't looking pregnant either. She had a nice dress on, sundress, whatever. So that's the only time that – circumstance or any situation that anything like that situation with him. And he left, he kept walking and were drinking. They were just walking around, literally. When we saw them again, we were playing ping-pong time and we were, "Let's just go." And it was, like, late, it was, like, maybe could be 10:00, 11:00. So we cut it short because we had to wake up early in the morning anyway. We grabbed some more food because she was pregnant, we grabbed more, like, sweets. And then we went to the room.
> ---
> Q: So at this foosball incident, he made a comment to you?
> A: Yeah. He said some comment there. Exactly the exact words I don't want to say because I don't really remember exactly, but he said something like, "Oh, let her win," or something like that, that terminology. Like you could tell he was just trying to, you know, to be funny. Like he bumped on the table on purpose. We noticed it. Because we were playing foosball and

2

HAMILTON, MILLER & BIRTHISEL LLP
150 SOUTHEAST SECOND AVENUE, SUITE 1200 · MIAMI, FLORIDA 33131
TELEPHONE: 305-379-3686 · FACSIMILE: 305-379-3690

> there was space for you to walk. That was pretty much -- but nothing was said, nothing else. He just kept walking and then we kept on about our game and then when we saw him coming back around, we were playing ping-pong, we just -- I mean, we left. When we saw him coming around after a while. He left and then he was coming around with a group trying to hang around the area of the little machine things to play, ended up leaving. We just called it a night. Well, we grabbed food and then we called it a night.

*See* Exhibit "C," Deposition of Plaintiff at 86:17-25, 87:1-19, 90:1-23.

8. Plaintiff admittedly did not report this confrontation to any crewmembers or employees of Classica Crews, and rather got food and went to his room. *Id.*

9. Plaintiff claims he did not respond to Mr. Hadley and left to avoid any issues.

> Q: And at the ping-pong table, you, once again, saw Mr. Hadley?
> A: I saw him afar getting close again, so we just decided to call it a night and get some food.
> Q: So you left to avoid any sort of issue?
> A: Yeah, any issue. We were, like, we just see, like, he's, like, we see, so we, like, you know.
> Q: After the ping-pong table, you and your wife went and got some sweets?
> A: Some sweets from the buffet, yeah.
> Q: And then retired to your room?
> A: Yeah.
> Q: And so that was the sum total of your – that was the sum total of your communication with Mr. Hadley on May 12th?
> A: Pretty much, yeah.

*See* Ex. "C" at 92:5-20.

**C. The incident – May 13, 2018.**

10. On the morning of May 13, 2018, Plaintiff and Ms. Dominguez were standing in the immigration line waiting to disembark the *Grand Classica*. Plaintiff recalls Mr. Hadley unexpectedly appeared and cut him in line, but admits that he initiated the communication prior to the physical altercation and engaged in mutual verbal attacks.

> Q: And the first -- when is the first time you see Mr. Hadley with the disembarkation process, what happens?
> A: I literally see him on the side of me and I started looking and then, like, I could

>  feel someone looking at me and I looked on the side and it's him. He then like he turns around and talks to his buddy and I thought he doesn't see me so they're all turning around looking the way of the lady in front of me with the rope and just moving in front of me. I'm just looking at her because, like, you know, and I tell him, "Hey, go to the back of line, don't try to skip," and then that's when the, like verbal altercation, this verbal -- he started telling me stuff and I told him stuff, too.

*See* Ex. "C," at 106:10-24.

11. Plaintiff remembered Mr. Hadley from their initial encounter at the foosball tables the night before.

> Q: And then this incident that occurred during -- while you were playing foosball, it was the same gentleman -- -
> A: Same one.
> Q: -- that you ultimately had a fight with while disembarking?
> A: Correct. He assaulted me.
> Q: And you remembered him, you remembered his face?
> A: Of course.

*See* Ex. "C," at 88:3-12.

12. Plaintiff is 6'3" and weighed 250 pounds at the time of the incident. He recalled Mr. Hadley was between 5'5" and 5'8" and weighed between 180 and 200 pounds.

> Q: How tall are you?
> A: I'm 6'3".
> Q: And you weigh how much?
> A: 250.
> Q: How much did you weigh back in May of 2018?
> A: 250.
> Q: The gentleman, I believe his name is Clint Hadley, does that sound familiar?
> A: Yes.
> Q: You said he is between 5'5" and 5'8"?
> A: That sounds about right.
> Q: How much does he weigh, do you think?
> A: He is a heavy-set kid. Maybe 180, 160. Maybe, 180, 200. Short, yeah.

*See* Ex. "C," at 89:12-25.

13. Plaintiff further admits to initiating racial slurs toward Mr. Hadley, as well as

4

HAMILTON, MILLER & BIRTHISEL LLP
150 SOUTHEAST SECOND AVENUE, SUITE 1200 · MIAMI, FLORIDA 33131
TELEPHONE: 305-379-3686 · FACSIMILE: 305-379-3690

engaging in a verbal back and forth argument.

> Q: When you saw Mr. Hadley standing next to you, that's when you commented that there was a line and he should go to the back?
> A: Pretty much.
> Q: How did he respond?
> A: He said, "I don't know what you're talking about. I've been here." He was just saying rude things and I just remembered the spic comment. That's pretty much it. Just being rude and just giving that energy, you know. That's all I remember.
> Q: You said spic?
> A: Yeah. Something like that. Something in spic. When he got mad and started to just be derogatory which was like right away after I told him like, "Get to the back of the line, bro. See ya."

*See* Ex. "C" at 108:5-19.

**D. Classica Cruise had no notice of a dangerous condition and was not negligent.**

14. Plaintiff admittedly did not report any issues with Mr. Hadley and his friends following their initial confrontation on May 12, 2018. *See* Ex. "C" at 86:17-25, 87:1-19, 90:1-23.

15. Classica Cruise's Corporate Representative, Grant Plummer, confirmed that in the entire cruise operation, there has never been an issue brought to the ship's attention of someone cutting someone in the disembarkation line, and a fight ensuing.

> Q: Okay. So in the entire cruise operation of The Defendant, they've never had an incident where someone cut in line during the disembarkation procedure, this was the first time?
> [Objection omitted]
> A: Well, maybe somebody cut in line at the buffet. I have no idea. I guess they could -- it could happen.
> Q: Well, I'm talking about the disembarkation procedure, not the buffet line.
> A: I have no knowledge of that ever happening prior.

*See* Exhibit "D," Deposition of Grant Plummer at 33:23-25, 34:1-10.

16. Mr. Plummer confirmed that the disembarkation process is very organized, and there are ample employees stationed in order to make disembarkation as smooth a process as possible.

5

HAMILTON, MILLER & BIRTHISEL LLP
150 SOUTHEAST SECOND AVENUE, SUITE 1200 · MIAMI, FLORIDA 33131
TELEPHONE: 305-379-3686 · FACSIMILE: 305-379-3690

> Q: So -- so the problem is you just said as the corporate representative for The Defendant as a part of its fourth affirmative defense that Plaintiff should have used his common sense and sought out an employee to address the issue of someone cutting in line. And when I asked you about whether or not how he would know that, you said there's people all posted all over the -- the ship to address that. So my question then is back to that means that The Defendant prior to this incident knows or is aware of that individuals may cut in line during the disembarkation procedure, correct?
>
> [Objection omitted]
>
> A: No, we have people to guide the guests to the proper area to wait for the disembarkation process to begin or to wait until it's their turn to be called off.
>
> Q: Okay.
>
> A: We have people at the stairwells. We have people in the lobby. We have people every step along the way that the guests can ask questions, receive directions on are they going to the proper location and so forth.

*See* Ex. "D" at 30:8-24, 31:2-7.

17. The crewmembers and security officers are trained to provide a safe environment for its passengers and crew.

> Q: So -- so when you say no -- so that is no -- well, and sometimes we get these double negatives so I just want to make sure for the purpose of the record. So your position is that The Defendant cruise line has no obligation for the safety of its passenger to ensure that they are not physically assaulted aboard its vessels?
>
> A: I'm saying that the cruise line takes responsibility that we want to provide a safe environment for all of our passengers and crew.
>
> Q: Okay. But in terms of the responsibility of prevention and deterrence of physical altercations aboard its vessels, is it The Defendant's position that they have no responsibility for the prevention or deterrence of physical assaults aboard its vessels?
>
> A: No, I didn't say that.
>
> Q: Okay.
>
> A: You know, obviously the security, they do an assessment every time a new group of passengers come onboard, and they're assessing the conditions of all the, you know, the behavior of the crew, of the passengers. So they're assessing the behavior of the passengers and they're walking around, they're going around to different lounges and seeing how the guests are interacting with one another and so forth, and they can identify if they think there's anybody that looks like they could become problematic later on.

*See* Ex. "D" at 80:6-25, 81:1-7.

18. Mr. Plummer further confirmed that Classica Cruise had no notice, neither actual

HAMILTON, MILLER & BIRTHISEL LLP
150 SOUTHEAST SECOND AVENUE, SUITE 1200 · MIAMI, FLORIDA 33131
TELEPHONE: 305-379-3686 · FACSIMILE: 305-379-3690

nor constructive, that this type of incident would occur, because there are policies and procedures in place and sufficient security officers and crewmembers stationed in and around the specific disembarkation area. Mr. Plummer further confirmed there have been no prior **substantially similar** incidents occurring on the Grand Classica, meaning a verbal argument leading to a physical altercation in the disembarkation line.

> Q: Okay. Provide me the facts that support that you didn't have notice.
> A: Everything was going orderly. As I said, the disembarkation process is very structured. We have policies and procedures in place. We have crew in place at specific strategic locations to direct the guests to keep everything orderly.
> Q: Okay. Any other facts -- and we'll start with that you had no actual notice that a physical altercation was going to occur. Any other facts to support that affirmative defense that you had no actual notice that a physical altercation was going to occur?
> A: We had no way of knowing that a physical altercation would occur.
> Q: Okay. Provide me the factual basis for that assertion.
> [Objection omitted].
> A: I just did. We have it -- we have it very structured. It's -- do I need to repeat myself?
> Q: Well, I need to -- well, my question after that was, is there any other facts besides that, and you said we had no idea. That's why I went -- had to go back and ask you again. So besides the orderly nature of the disembarkation procedure that you allege, is there any other facts to support the affirmative defense that you had no actual notice that a physical altercation was going to occur?
> A: Other than the fact that we've never had a physical altercation during the disembark process.
> Q: Okay. But you have had physical altercations -- well, I think we're getting ahead of ourselves. Okay. So for actual notice, your statement is that with regard to actual notice that a physical altercation was going to happen between The Plaintiff and Mr. Hadley, the fact is that you've never had a physical allocation during a disembarkation procedure before. Any other facts?
> A: In addition to the fact that I've stated multiple times that we have a complete disembarkation process and policy that we follow, and that we have crew members posted at strategic locations around the vessel to guide and direct guests to the location where they need to be to disembark in an orderly process.
> Q: Anything else?
> A: That would be it.

*See* Ex. "D" at 49:2-25, 50:1-25.

19. This type of random incident is totally unforeseeable and Classica Cruise is

7

HAMILTON, MILLER & BIRTHISEL LLP
150 SOUTHEAST SECOND AVENUE, SUITE 1200 · MIAMI, FLORIDA 33131
TELEPHONE: 305-379-3686 · FACSIMILE: 305-379-3690

unable to know how someone is going to respond in a situation without even a warning. And as Plaintiff admitted, he did not warn any crewmembers or employees aboard the ship of an issue with Mr. Hadley prior to the incident.

> Q: So it's pretty common knowledge, like, you don't know how someone is going to respond and you say something, anything can happen, including a physical altercation?
> A: Correct.
> Q: Okay. All right. Going on to the 18th affirmative defense. What's the factual basis for the assertion that The Defendant had no duty to prevent an intentional assault?
> A: We have no way of knowing.
> ---
> Q: Okay. And -- strike that. And then the last one is the 19th affirmative defense, which states that the assault was not reasonably foreseeable. And I believe we covered that in one of the affirmative defenses, but to the extent we want to go back through it, can you provide me the factual basis that this assault was not reasonably foreseeable.
> A: It was not foreseeable. As I said, you know, the security onboard, they're constantly assessing the guests. And these two gentlemen were not on the radar. This is something that was just, you know, precipitated by a comment. It was a hot headed reaction to a comment and it's nothing that could be -- could have been predicted -- predicted that would happen.

*See* Ex. "D" at 79:9-18, 84:11-25.

20. During Mr. Plummer's deposition, Plaintiff attempted to show that because there have, in general, been prior incidents of fighting aboard the Grand Classica's fleet mate, the Grand Celebration, that Classica Cruise had knowledge of prior **substantially similar** incidents, thus giving rise to notice.

21. However, the point Plaintiff was trying to make is not upholding the standard of the law. Plaintiff has not shown that Classica Cruise had knowledge, from prior incidents, that a dangerous condition existed in the specific area of the incident, to wit: a verbal argument leading to a physical altercation while standing in the immigration line waiting to disembark the ship.

> Q: Okay. So you -- so before May 13, 2018, we can agree The Defendant had that knowledge that a statement made from one passenger to another could lead to a verbal altercation, correct?

8

HAMILTON, MILLER & BIRTHISEL LLP
150 SOUTHEAST SECOND AVENUE, SUITE 1200 · MIAMI, FLORIDA 33131
TELEPHONE: 305-379-3686 · FACSIMILE: 305-379-3690

| | |
|---|---|
| A: | It potentially could, just like it could if you're in line at the supermarket. |
| Q: | Okay. And sometimes -- and The Defendant is aware prior to May 13, 2018 that a verbal altercation could lead to a physical altercation, correct? |
| A: | Anything can happen. |
| Q: | I understand we're saying anything can happen. I'm talking specifically, The Defendant that a -- has knowledge prior to May 13, 2018 that a verbal altercation could lead to a physical altercation, correct? |
| A: | It could if you're dealing with two hot heads. It very well could. |
| Q: | Okay. So Defendant maintains it has that knowledge that a verbal altercation could result in a physical altercation, correct? |
| A: | Correct. |
| Q: | And that knowledge was in its possession prior to May 13, 2018, correct? |
| A: | Correct, it's just human nature. |
| Q: | Right. And, in fact, two days prior on the sister ship on May 11, 2018, there was a verbal altercation that led to a physical altercation, correct? |
| A: | It does happen. |
| Q: | No, no, I'm not talking about it does happen. We were provided by The Defendant, your counsel, in discovery a list of various instances aboard the sister ship and one of which was on May 11, 2018, that the -- there was a verbal altercation that led to a physical altercation, just two days before our incident. Are you aware of that, sir? |
| A: | I've seen the list. |
| Q: | Okay. So you're aware that just two days before, you had a verbal altercation on the Defendant -- one of The Defendant's vessels that lead to a physical altercation, right? |
| A: | If the May 11 is on the list, then, yes. |
| Q: | Okay. So -- so that means The Defendant in addition to what we talked about human nature and what, had specific knowledge of a prior instance occurring just two days before where a physical altercation resulted or, excuse me, where a verbal altercation resulted in a physical altercation, right? |
| A: | Okay. |

*See* Ex. "D" at 35:2-25, 36:1-25.

22. The prior incident that Plaintiff repeatedly brought up during the deposition of Mr. Plummer is not a prior substantially similar incident. The May 11, 2018 incident on the Grand Celebration ship involved a domestic dispute inside of a cabin. *See* Ex. "B."

23. This private matter did not occur between two unfamiliar passengers, in line during the disembarkation process of the ship. *See* Ex. "B."

24. Mr. Plummer confirmed (multiple times) that the company has never had a

9

HAMILTON, MILLER & BIRTHISEL LLP
150 SOUTHEAST SECOND AVENUE, SUITE 1200 · MIAMI, FLORIDA 33131
TELEPHONE: 305-379-3686 · FACSIMILE: 305-379-3690

physical altercation occur during the disembarkation process.

> Q: Well, I need to -- well, my question after that was, is there any other facts besides that, and you said we had no idea. That's why I went -- had to go back and ask you again. So besides the orderly nature of the disembarkation procedure that you allege, is there any other facts to support the affirmative defense that you had no actual notice that a physical altercation was going to occur?
> A: Other than the fact that we've never had a physical altercation during the disembark process.
> Q: Okay. But you have had physical altercations -- well, I think we're getting ahead of ourselves. Okay. So for actual notice, your statement is that with regard to actual notice that a physical altercation was going to happen between The Plaintiff and Mr. Hadley, the fact is that you've never had a physical allocation during a disembarkation procedure before. Any other facts?
> A: In addition to the fact that I've stated multiple times that we have a complete disembarkation process and policy that we follow, and that we have crew members posted at strategic locations around the vessel to guide and direct guests to the location where they need to be to disembark in an orderly process.

*See* Ex. "D" at 49:24-25, 50:1-25.

25. There is nothing even remotely similar between the May 11, 2018 Grand Celebration incident and the one at hand. Simply because physical altercations have generally occurred on a cruise ship does not mean that those incidents are prior substantially similar incidents as defined by the law.

26. Classica Cruise was not negligent, it had no actual or constructive notice of a dangerous condition associated with physical violence at the disembarkation line, and thus it had no duty to warn.

**Dated: February 21, 2020**

Respectfully submitted,

/s/ *William F. Clair*
Jerry D. Hamilton, Esq.
Florida Bar No. 970700
jhamilton@hamiltonmillerlaw.com
William F. Clair
Florida Bar No. 693741

10

HAMILTON, MILLER & BIRTHISEL LLP
150 SOUTHEAST SECOND AVENUE, SUITE 1200 · MIAMI, FLORIDA 33131
TELEPHONE: 305-379-3686 · FACSIMILE: 305-379-3690

CASE NO. 0:19-cv-60883-WJZ

>wclair@hamiltonmillerlaw.com
>Annalisa Gutierrez
>Florida Bar No. 97940
>agutierrez@hamiltonmillerlaw.com
>Sharhonda Robinson-Edwards
>Florida Bar No. 98755
>srobinson@hamiltonmillerlaw.com
>HAMILTON, MILLER & BIRTHISEL, LLP
>150 Southeast Second Avenue
>Suite 1200
>Miami, Florida 33131-2332
>Telephone:   305-379-3686
>Facsimile:    305-379-3690
>***Attorneys for Defendant***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 14, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing is being served this day on all counsel of record or *pro se* parties identified on the following Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically notices of Electronic Filing.

>*/s/ William F. Clair.*
>William F. Clair, Esq.

CASE NO. 0:19-cv-60883-WJZ

## SERVICE LIST

| | |
|---|---|
| FISHER REDAVID, PLLC | Jerry D. Hamilton, Esq. |
| John P. Fischer, Esq. | Florida Bar No. 970700 |
| Service@fritriallawyers.com | jhamilton@hamiltonmillerlaw.com |
| Florida Bar No. 99751 | William F. Clair |
| 4601 Sheridan Street, Suite 320 | Florida Bar No. 693741 |
| Hollywood, Florida 33021 | wclair@hamiltonmillerlaw.com |
| Telephone: (954) 860-8484 | Annalisa Gutierrez |
| Fax: (954) 860-8584 | Florida Bar No. 97940 |
| *Attorney for Plaintiff* | agutierrez@hamiltonmillerlaw.com |
| | HAMILTON, MILLER & BIRTHISEL, LLP |
| | 150 Southeast Second Avenue |
| | Suite 1200 |
| | Miami, Florida 33131-2332 |
| | Telephone: 305-379-3686 |
| | Facsimile: 305-379-3690 |
| | *Attorneys for Defendant* |